## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

WILLIAM MONTGOMERY,[1] #40392-037        *

Petitioner                                              *

v.                                                      *            Civil Action No. RDB-13-1223

STATE OF MARYLAND, et al.                               *

Respondent                                              *
                                                      ***

### MEMORANDUM OPINION

Before the Court is William Montgomery's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF 1). Respondents have answered, arguing that the Petition should be denied. (ECF 6). Montgomery thereafter filed a reply. (ECF 8). After reviewing these papers, the Court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts; see also* 28 U.S.C. §2254(e)(2). For the reasons set forth herein, the Court shall DENY AND DISMISS the Petition with prejudice.

### PROCEDURAL HISTORY

On May 15, 2003, Montgomery pleaded guilty in the Circuit Court for Baltimore City to one count of first-degree murder and one count of use of a handgun in commission of a crime of violence. (ECF 6-2, p. 7). He was sentenced on December 18, 2008,[2] to life imprisonment with all but 25 years suspended on the murder charge and 20 years concurrent, with the first 5 without parole, on the gun charge. (ECF 6-3, p. 42). The trial judge postponed issuance of the judgment pending completion of certain matters. *Id.* at 43. After a brief hearing, the judge imposed the sentence and entered judgment on February 4, 2009. (ECF 6-4, p. 4).

---

[1] Montgomery is also known as Michael Rowe. (ECF 6-2, p. 1).

[2] The reasons for the delay in sentencing were to allow Petitioner to comply with the terms of the plea agreement and a series of requests for continuance. (ECF 6-1; ECF 6-2, p. 3; ECF 6-3, p. 3).

On February 27, 2009, Montgomery, acting *pro se*, noted an appeal, followed by a Motion for Direct Appeal of Sentence. (ECF 6-5). Subsequently, now represented by counsel, Montgomery filed a Motion to Treat Notice of Appeal as Application for Leave to Appeal and for Leave to Supplement. (ECF 6-5). In an order issued on June 4, 2009, the Court of Special Appeals of Maryland granted the motion and agreed to treat it as an application for leave to appeal. (ECF 6-6). Thereafter, Montgomery, through counsel, filed a Supplement to his Application. (ECF 6-5). However, on December 27, 2010, that court denied the Application. (ECF 6-8).

Montgomery filed a Petition for Post-Conviction Relief in the Circuit Court for Baltimore City on August 15, 2011, (ECF 6-9), followed on October 4, 2011, by an Amended Petition, (ECF 6-10). On October 1, 2012, after hearing, Respondent's Motion to Dismiss was granted and Montgomery's Petition for Post-Conviction Relief was denied. (ECF 6-11, p. 15). Although Montgomery indicates that he filed an Application to Appeal the denial to the Court of Special Appeals, (ECF 1, p. 4), Respondent disputes that such Application was filed, (ECF 6, p. 6). The Circuit Court docket in Montgomery's criminal case does not reflect that an Application for Leave to Appeal to the Court of Special Appeals was filed. (ECF 6-1, pp. 10-11.)

The current Petition was received by this Court on April 25, 2013.[3]   Montgomery subsequently filed a supplement to the Petition. (ECF 5). Respondents filed their Answer on July 19, 2013, to which Petitioner responded on August 14, 2013.

## DISCUSSION

Montgomery raises four grounds for relief:

(1) The State breached the plea agreement during sentencing by failing to recommend a

---

[3] Montgomery's Petition is signed April 23, 2013 (ECF 1, p. 11), and is deemed filed on that date. *See Houston v. Lack*, 487 U.S. 266 (1988); *Lewis v. Richmond City Police Department*, 947 F.2d 733, 734-35 (4th Cir. 1991); *United States v. Dorsey*, 988 F. Supp. 917, 919-20 (D. Md. 1998).

sentence based upon the extent of Montgomery's cooperation;

(2) The State breached the plea agreement by informing the court of other crimes in which Montgomery was involved, information which was provided by Montgomery during proffer sessions;

(3) Assistant United States Attorney Robert Harding ("Harding") made false statements and omissions to the judge when asked if anyone else was charged with the murder to which Montgomery plead guilty; and

(4) Trial counsel was ineffective by failing to object to the State's breach during sentencing.

(ECF 5, p. 9).

The first issue the Court must decide is whether the Petition is properly before the Court. That determination turns on whether Montgomery has exhausted his claims, or procedurally defaulted them, in the state courts.

## I. EXHAUSTION AND PROCEDURAL DEFAULT

The exhaustion doctrine, codified at 28 U.S.C. 2254(b)(1),[4] "is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings. Under our federal system, the federal and state courts [are] equally bound to guard and protect rights secured by the Constitution." *Rose v. Lundy*, 455 U.S. 509, 518 (1982) (alteration in original)(internal citations and quotation marks omitted). Moreover, "it

---

[4] Section 2254 states that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
> (A) The applicant has exhausted the remedies available in the courts of the State; or
> (B) (i) there is an absence of available State corrective process; or
>     (ii) circumstances exist that render such process ineffective to protect the
>     rights of the applicant.

28 U.S.C. § 2254(b)(1).

3

would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation ....'" *Id.* Thus, the *Rose* Court cautioned litigants, "before you bring any claims to federal court, be sure that you first have taken each one to state court." *Id.* at 520; *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999)("Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court."). Here, Petitioner cannot return to state court to exhaust his remaining claims, having procedurally defaulted them.

In *O'Sullivan*, the Supreme Court stated: "To ... 'protect the integrity' of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts." 526 U.S. at 848 (internal citation omitted); *see also id.* at 844 ("Section 2254(c)[5] requires only that state prisoners give the state courts a *fair* opportunity to act on their claims."). The inquiry, then, is "[w]hether a prisoner who fails to present his claims in a petition for discretionary review to a state court of last resort has *properly* presented his claims to the state courts. ... Because we answer this question 'no,' we conclude that Boerckel has procedurally defaulted his claims." *Id.* at 848. In other words, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* at 845. The *O'Sullivan* Court noted, however, that:

> In this regard, we note that nothing in our decision today requires the exhaustion of any specific remedy when a State has provided that that remedy is unavailable. Section 2254(c), in fact, directs federal courts to consider whether a habeas petitioner has "*the right under the law of the State to raise, by any available procedure,* the question presented." (Emphasis added.) The exhaustion doctrine,

---

[5] Section 2254(c) provides that: "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

in other words, turns on an inquiry into what procedures are "available" under state law. In sum, there is nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is not available.

*Id.* at 847-48. [6]

In his *pro se* Motion for Direct Appeal of Sentence, which accompanied his Notice of Appeal, Montgomery claimed that the State violated the plea agreement by informing the court of other crimes in which Montgomery participated, contrary to his understanding, and, also contrary to his understanding, failed to make a sentencing recommendation "commensurate and reflective of [his] cooperation." (ECF 6-5, p. 2). Montgomery, through counsel, thereafter filed a motion to treat his Notice of Appeal as an Application for Leave to Appeal and for Leave to Supplement. *Id.* at 4. The Motion reiterated the claims Montgomery had raised in his *pro se* motion. *Id.* at 5. The supplement, filed after the Court of Special Appeals granted the Motion, (ECF 6-6, p. 1), under the heading "Question Presented," presented only the following question:

> Were Applicant's pleas of guilty to first degree murder and the use of a handgun in the commission of a crime of violence invalid because the trial court did not explain the nature of the charges and the elements of the crime to Applicant on the record or obtain a representation by either defense counsel that he had informed Applicant of the nature of the crime and the elements of the charge to which he was pleading guilty or from the Applicant that he had been so informed?

(ECF 6-5, p.8).[7] The Court of Special Appeals subsequently denied Montgomery's Application for Leave to Appeal.[8] (ECF 6-8).

---

[6] In addition, procedural default may occur when a state court declines "to consider the merits [of a claim] on the basis of an adequate and independent State procedural rule." *Yeatts v. Angelone*, 166 F.3d 255, 260 (4th Cir. 1999). "A procedural default also occurs when a habeas petitioner fails to exhaust available State remedies and 'the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.' " *Breard v. Pruett*, 134 F.3d 615, 619 (1998) (quoting *Coleman v. Thompson*, 501 U.S. 722, 375 n.1 (1991)).

[7] Montgomery does not raise this ground in the current Petition.

[8] If an appeal of right is not permitted, as in cases such as Montgomery's where a guilty plea is entered, exhaustion can be accomplished by filing an Application for Leave to Appeal to the Court of Special Appeals. Md. Cts. & Jud.

In his Amended Petition for Post-Conviction Relief, filed in the Circuit Court for Baltimore City, Montgomery again claimed that the State had breached the plea agreement by failing to make a recommendation based on the extent of his cooperation and by informing the court of other crimes in which he had been involved. (ECF 6-10, p. 3). Montgomery added claims which had not been raised previously: that Harding had made false statements and omissions in the course of Montgomery's sentencing; that trial counsel had been ineffective for failing to object to the alleged breach of the plea agreement; and that appellate counsel had been ineffective for failing to include the breach of plea agreement issue in the supplement to the application for leave to appeal.[9] (ECF 6-10, p. 3-4). The Circuit Court denied the Petition for Post-Conviction Relief. (ECF 6-11, p. 15). Montgomery did not file an Application for Leave to Appeal the denial of his post-conviction petition to the Court of Special Appeals.[10]

It is a habeas petitioner's burden to prove that a claim is exhausted. *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998). Based on the foregoing, it is clear that Montgomery never exhausted at least two of the claims presented to this Court, namely the false statements/omissions and ineffective assistance of trial counsel claims, because they were raised for the first time in his petition for post-conviction relief, for which he failed to seek leave to

---

Proc. Code Ann., § 12-302(e). If the Court of Special Appeals denies the application, there is no further review available and the claim is exhausted. Md. Cts. & Jud. Proc. Code Ann., § 12-202.

[9] This claim is also not before this Court. Although Montgomery mentions the ineffective assistance of appellate counsel issue in the current Petition, it is in the context of describing his State Petition for Post-Conviction Relief. (ECF 1, p. 8; ECF 5, p. 8).

[10] As noted previously, Montgomery states in his Petition that he filed an Application for Leave to Appeal the denial of his post-conviction petition. (ECF 1, p. 4). Respondents deny that Montgomery sought leave to appeal the denial. (ECF 6, p. 6). The evidence belies Montgomery's assertion. There is no indication on the Circuit Court docket that an Application for Leave to Appeal was filed. (ECF 6-1, pp. 10-11). In fact, there is a notation dated October 2, 2012, that the case was closed. *Id.* at 10. Interestingly, asked on his Petition in this Court for the date of the denial of the alleged Application for Leave to Appeal his post-conviction relief petition, Montgomery lists the date the Court of Special Appeals denied his Application for Leave to Appeal his plea. (ECF 1, p. 4). That date, December 27, 2010, predates the filing and denial of his petition for post-conviction relief, August 15, 2011, and October 1, 2012, respectively. (ECF 6-11, p. 9-10).

appeal. *See O'Sullivan*, 526 U.S. at 845 (noting that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."). Since he is precluded from doing so now, because under Maryland law a petitioner may bring only one petition for post-conviction relief, *see* Md. Code. Ann., Crim. Pro. Art., § 7-103(a), those claims are procedurally defaulted and are not properly before this Court.

As for Montgomery's breach of plea agreement claim, the State contends that this claim, too, is procedurally defaulted. Arguably he exhausted that claim by presenting it in his application for leave to appeal to the Court of Special Appeals (although it was not contained in the Supplement to that Application[11]). The waters are muddied somewhat by the fact that Montgomery also included the claim in his petition for post-conviction relief, but did not seek leave to appeal the denial of that petition. If the State's position is correct, then Montgomery has procedurally defaulted all of his claims and the Petition should be dismissed on that basis alone.[12]

When a claim is procedurally defaulted, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show: (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits; or (2) that failure to consider the claim on the merits would result in a miscarriage of justice, i.e., the conviction of

---

[11] Later, in the substantive portion of the Supplement, the question previously quoted is titled "Reason for Granting the Application for Leave to Appeal." (ECF 6-5, p. 10). No other issues are discussed.

[12] If the State is incorrect, and Montgomery has exhausted this claim, the Court, at best, is presented with a "mixed" petition. In *Rose*, the Supreme Court established a "total exhaustion" rule, 455 U.S. at 513, and held that "a district court must dismiss such 'mixed petitions,' leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims to the district court," *id.* at 510. As noted previously, however, Montgomery has no "available procedure," 28 U.S.C. § 2254 (c), to present his unexhausted (or procedurally defaulted) claims to the state courts. Nor may he resubmit his petition, as the one-year statute of limitations for doing so has expired. *See* 28 U.S.C. § 2244(d)(1). Moreover, as discussed herein, allowing Montgomery to amend the Petition would be futile.

one who is actually innocent. *See Murray v. Carrier*, 477 U.S at 495-96 (1986). "Cause" consists of "some factor external to the defense [that] impeded counsel's efforts to raise the claim in State court at the appropriate time. *Breard*, 134 F.3d 615, 620 (4th Cir. 1998). Even when a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of a petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314 (1995).

Montgomery attempts to show cause for the procedural default by arguing that because of his status in the federal witness protection program there is a delay in mail reaching him. (ECF 8, p. 2). Although he states that he realized the Application for Leave to Appeal the denial of his post-conviction petition was time-sensitive, by the time he received the documents from the court it was too late to file. *Id.* The fact that Montgomery had been in federal custody (first as a probation violator and subsequently as a material witness) (ECF 6-3, p. 30) since at least the May 15, 2003, plea hearing (ECF 6-2, pp. 26-27), if not before, undermines his contention.[13] His counsel for the post-conviction relief petition advised Montgomery to file a motion asking for more time, which Montgomery claims he did, but received no response from the court. *Id.* Again, there is no indication on the docket in Montgomery's criminal case that such motion was ever filed. (ECF 6-1, p. 10).

Montgomery also asks the Court to consider that "the petitioner really has no idea how to do this legal formalities of filing all these petitions and motions etc." (EF 8, p. 3). The same could be said of many, if not all, prisoners. Petitioner's explanation again does not constitute

---

[13] In his Response to the State's Answer, Montgomery alleges that he had raised the delayed mail issue with the unit manager where he is housed. (ECF 8, p. 2).

cause,[14] let alone a fundamental miscarriage of justice.[15]  In any event, Petitioner's procedural default would not alleviate the need to exhaust his state court remedies.

Even if Montgomery had properly exhausted all of his claims, which he has not, his Petition would fail on the merits.  Section 2254 states that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2).  Accordingly, the Court turns to the merits of Montgomery's claims.

## II. STANDARD OF REVIEW

An application for writ of habeas corpus may be granted only for violations of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a).  Section 2254(d) provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States: or
>
> (2) resulted in a decision  that was based on a unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d).  The statute sets forth a "highly deferential standard for evaluating state-court rulings, *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), and is "difficult to meet," *Cullen v. Pinholster*, 563 U. S. __, __, 131 S. Ct. 1388, 1398 (2011).

A state adjudication is contrary to clearly established federal law under ¶ 2254(d)(1)

---

[14] If a court finds no cause for the procedural default, it need not address the issue of prejudice.

[15] Montgomery's only reference remotely related to a fundamental miscarriage of justice argument is to ask the Court to "hold a hearing in the interest of justice." (ECF 8, p. 3). However, as discussed *infra*, because there was no breach of the plea agreement, there can be no miscarriage of justice.

where the state court "arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme] Court." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Under the "unreasonable application analysis" under 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 786 (2011)(quoting *Yarborough.v Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable application of federal law is different from an incorrect application of federal law. *Id.* at 785 (internal quotation marks omitted).

Under § 2254 (d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," *id.*, a federal court may not conclude that the state court decision was based on an unreasonable determination of the facts, *id.* "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). "The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state

10

court's part." [16] *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where

the state court has "resolved issues like witness credibility, which are 'factual determinations' for

purposes of Section 2254(e)(1)." *Id.* at 379. Montgomery's claims will be examined under this

framework.

### III. MONTGOMERY'S CLAIMS

#### A. BREACH OF PLEA AGREEMENT

As noted above, Montgomery claims that the State breached the plea agreement by

failing to recommend a sentence based on the extent of his cooperation with authorities and by

informing the court of other crimes in which he was involved, even though he was the one who

informed authorities of those crimes in a proffer session. (ECF 1, pp. 5-6).

For the first part of his argument that the State breached the plea agreement, Montgomery

relies on ¶ 3.c. of that agreement, which states:

> At the Defendant's sentencing, the State will make a recommendation regarding
> the sentence the Defendant shall receive based upon the extent of the Defendant's
> cooperation pursuant to this Agreement. If the Defendant completes all of the
> terms and conditions set forth in this agreement to the satisfaction of the State, the
> State will recommend that the Defendant receive a maximum sentence of life
> imprisonment, with all but a cap of forty (40) years suspended, followed by five
> (5) years supervised probation upon his release. The State shall have sole
> discretion in determining whether to make such a recommendation.

(ECF 1-2, p. 4).[17] The agreement further provides that "[t]he State may recommend to the Court

any sentence that the State considers appropriate, up to and including the maximum prison

sentence allowable by law, which is imprisonment for a term of life plus twenty (20) years." *Id.*

Montgomery indicated that he fully understood the maximum penalty for each count. *Id.* at 3.

---

[16] In this regard, the Court notes the Circuit Court for Baltimore City addressed all of the claims raised in the instant
Petition in a thorough Memorandum and concluded, after hearing, that all claims lacked merit. (ECF 6-11).
Accordingly, Montgomery's state Petition for Post-Conviction Relief was denied. *Id.* at 14-15.

[17] It appears that Montgomery misunderstands the terms of the plea agreement. He states in his Petition that "[t]here
was no specific number of years the state was to recommend in this plea agreement. Only a number that could not
be exceeded. And that is what the cap of forty years meant in this agreement ...." (ECF 1, p. 5).

Questioned by Judge Wanda Heard at the plea hearing, Montgomery also stated that he understood the maximum penalty for each count. (ECF 6-2, p. 11). Plaintiff's counsel described the plea agreement:

> And the agreement is that Mr. Montgomery would receive a sentence of life, suspend all but a cap of 40 years and five years of supervised probation. At the time of the sentencing the defense will be free to argue for less than the 40 years depending on Mr. Montgomery's adherence to the terms of the conditions in the plea agreement.

(ECF 6-2, p. 3). The State reiterated the terms of the agreement regarding sentencing, noting that "the cap is life, suspend all but a cap of 40. So it's a life sentence, he's definitely going to get a life sentence. The Court can suspend anywhere down from 40 on down." *Id.* at 4. The judge stated that she would sentence Montgomery in accordance with the plea agreement, *id.* at 5, but ensured that Montgomery understood that in the end she would make the final sentencing determination, *id.* at 15, 21.

At the December 8, 2008, sentencing hearing, Judge Heard noted her recollection of the plea hearing:

> It was understood that at the time of sentencing there may or may not be a request by the State or the Government for a particular sentence. My notes reflect that the agreement contemplated that the sentence would be life suspend all but 40 years, but there would be a cap to be argued by the Defense of less than that sentence in the event that there was substantial cooperation in other matters.

(ECF 6-3, pp. 3-4). She asked if there were any motions to breach the plea agreement, to which the State responded "No ma'am." *Id.* at 8. Harding then stated that it would make the recommendation provided in ¶ 3.c. of the agreement, which was contingent on Montgomery fully satisfying the terms of the plea agreement. *Id.* at 8-9.

With regard to Montgomery's cooperation, at the sentencing hearing Harding extolled the extent of his cooperation, stating that Montgomery had done more than "fully satisfying terms of

the plea agreement." *Id.* at 9. Harding then described the extent of Montgomery's cooperation, as well as the sacrifices Montgomery had made as a result of that cooperation. *Id.* at 9-15. However, Harding believed that he "might endanger the Federal convictions in this case if I make a specific recommendation for a period of incarceration lower than the term that is provided for in the plea agreement *Id.* at 20. Defense counsel stated that the cap was put in the plea agreement because the defense had asked for it, but that she "didn't foresee this amount of cooperation." *Id.* at 28. The defense asked Judge Heard for a sentence of "life suspend all but 20." *Id.* Judge Heard ultimately sentenced Montgomery to life with all but 25 years suspended on count one and 20 years on count two (with the understanding that the first 5, the mandatory minimum, would be without parole), to be served concurrently. *Id.* at 42.

Harding did not breach the plea agreement. He followed the terms specified in the agreement, which did not require him to make a different recommendation. Judge W. Michel Pierson, the Circuit Court judge who heard and denied Montgomery's state Petition for Post-Conviction Relief, noted the "State's lockstep compliance with the precise terms of the plea agreement." (ECF 6-11, p. 7). As stated above, the plea agreement provided that if Montgomery "completes all of the terms and conditions set forth in this agreement to the satisfaction of the State, the State will recommend that the Defendant receive a maximum sentence of life imprisonment, with all but a cap of forty (40) years suspended, followed by five (5) years of supervised probation upon his release." (ECF 1-2, p. 4). In addition, Harding made the sentencing judge fully aware of the extent of Montgomery's cooperation with the Government. Judge Pierson was not persuaded by this portion of Montgomery's argument that the State breached the plea agreement, nor is this Court. Specifically, Judge Pierson stated that: "It is perfectly clear that the State recommended the specific sentence that was contemplated and

required by the plea agreement. Consequently, the State performed its obligations and was not in

breach of the plea agreement. Therefore, there is no basis for relief on this allegation." (ECF 6-

11, p. 8).

Montgomery relies on both the plea agreement and, to a lesser extent, the proffer letter

for the second part of his argument regarding the alleged breach of the plea agreement. The

language of the plea agreement contemplates use of the information about which he complains:

> In connection with the Defendant's sentencing, the State will inform the Court of
> (i) the nature and extent of the Defendant's cooperation; (ii) all other information
> with respect to the Defendant's background, character, and conduct which this
> Office deems relevant to sentencing, including the conduct that is the subject of
> the above-captioned indictment; and (iii) any failure by the Defendant to fulfill
> any or all of his obligations pursuant to this agreement. In so doing, this Office
> may use any information it deems relevant, including information provided by the
> Defendant both prior to and subsequent to the signing of this agreement.

(ECF 1-2, p. 3). The agreement further states:

> In order to permit the Defendant to make disclosures to the State and other
> designated law enforcement officers under this agreement, any information and
> documents that that he fully and truthfully discloses to the State during the course
> of his cooperation pursuant to this agreement will not be used against him,
> directly or indirectly, by the State in any criminal case, except as otherwise
> provided in this agreement.

*Id.* at 4.

The state court found that "the record [did] not support petitioner's characterization that

by furnishing this information to Judge Heard, the State was using this information 'against

him.'" (ECF 6-11, p. 9). As noted by Judge Pierson, the information was part of Harding's

glowing description of Montgomery's cooperation and was necessary to "place his cooperation

in context." *Id.*

Moreover, there is no evidence that the fact that the court had information regarding

Montgomery's prior crimes had any effect on his sentence. Montgomery himself states that:

Informing the sentencing Judge of this information could have played a part of the Petitioner not getting the sentence that him and his counsel were arguing down for. Being as though Judge Heard, heard that information there is no clear way to tell if it played a part in the sentence she choose to give.

(ECF 1-1, p. 4).   That is exactly the problem with Montgomery's argument.   Absent any evidence to  support his contention that the information about previous criminal activities had a negative impact on the judge's sentence, a mere possibility that the information had an impact on his sentence cannot constitute a violation of the plea agreement.

In fact, Judge Heard appears to have imposed the sentence in part based on her perception of who Montgomery had been versus who he had become.  She first noted Montgomery's past:

You know that if I were straight with you, I would call you a stone cold murderer, that's what you were. That's what you were. And you were in it deep. You've turned the heads of everyone that you've spoken to because that's just how deep you were. And by all counts, no one had ever seen anyone that steeped in horrors of our society, that steeped in iniquity that they would even reach up, shake it off, and do the right thing. B[y] all accounts you should have been unreachable, hardened by what you were doing. Senseless murders for money.

(ECF 6-3, p. 36).  However, she continued:

I'm prepared to sentence you for your character. Because what you were was a stone cold murderer. But what you've become is quite a different man. And I don't know anybody in this room that could stand up and say that they would have done what you did by telling on everyone in the face of what you've done and the continued threats to your life. I don't know many people that could say that they would do that.

*Id.* at 37.   She recognized the extent of his cooperation with authorities, "taking into consideration the depth and quantity of the cooperation in this case."  *Id.* at 41.  She concluded by stating:

And I will say again, you brought to justice people that were beyond the reach of the Government and the State. For that, on behalf of the citizens of Baltimore City, I thank you. Because without your guts and integrity, no matter what your past might have been, we wouldn't have had those individuals brought to justice. And you didn't have to give up as much information as you did, but you did so for whatever reason and I thank you for it. My sentence is appropriate, but I had to

sentence you for the crime that you committed, which is a murder. ...

*Id.* at 44.  She also stated that Montgomery would be given credit for every day he had been in

federal custody, *id.* at 35, and ensured that he would remain in federal custody because if he were

transferred to state custody, "it would mean certain death for this man and this is not a death

sentence," *id.* at 33.

It is clear from the foregoing that Judge Heard's knowledge of Montgomery's past did

not negatively impact the sentence she ultimately imposed.  It is entirely possible that the

information had the opposite effect, by illustrating how much he had changed.  Therefore, this

Court finds Montgomery's second argument that the State breached the plea agreement by

providing information pertaining to Montgomery's past meritless, as did the Circuit Court.

Montgomery has not met his burden of rebutting the presumption that the State's finding

that the plea agreement was not breached was correct.  His opinion that there was a breach

clearly does not constitute "clear and convincing evidence."  The plea agreement itself, which

Montgomery attached to the Petition, in fact undermine his claim of a breach.  Therefore, the

Court presumes the correctness of the state court's findings.  For that reason, and for the reasons

stated above, Montgomery's first claim is rejected.

### B. FALSE STATEMENTS OR OMISSIONS

Montgomery alleges that Harding made false statements or omissions to the sentencing

judge.  (ECF 1, p. 6).  Montgomery points to one instance where Harding made an allegedly

untrue statement: that two individuals were charged by federal authorities with the murder of

Terry Cheeks, *id.*, the person whom Montgomery pled guilty to killing, (ECF 6-2, p. 16).

Montgomery asserts that the statement was "completely untrue," (ECF 1, p. 10), that "[t]hose

charges do not exist," (ECF 1-1, p. 6), and that he had so informed Harding in a proffer session,

(ECF 1, p. 10).  Montgomery lists no omissions in the Petition, *id.*, or his memorandum in support. (ECF 1-1, p. 6).

Judge Pierson found that Montgomery had failed to set forth any evidence of his allegations.  (ECF 6-11, p. 14).  Without such foundation, Judge Pierson found Petitioner's allegations "bald [and] conclusory," *id.*, and denied relief based on this claim, *id.*

Montgomery has provided no more specific information to this Court than he did in the state court.  He has cited one example of at best a mistake of fact and at worst a false statement.  It was not part of the statement of facts presented at the plea hearing before Judge Heard.  (ECF 6-2, pp. 22-24).  Moreover, Montgomery points to no harm to his case the statement may have caused—indeed, the statement appears to be totally irrelevant.  Accordingly, Montgomery's second claim also fails.

## C. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Finally, Montgomery alleges that his trial counsel was ineffective by failing to object to the breach of the plea agreement during the sentencing, "before or after the Petitioner told her that they were breaching the plea agreement." (ECF 1, p. 6). Montgomery concedes, however, that if there is no breach of the plea agreement, then there is no ineffective assistance of counsel. *Id.*  The Court agrees.  If the plea agreement was not breached, there was nothing to which counsel could object.  Having found no breach of the plea agreement, Montgomery's ineffective assistance claim necessarily fails.[18]

---

[18] Judge Pierson so found.  He noted that trial counsel's

> failure to object is of no consequence if there was no basis for an objection.  The assertion that she should have objected is based on the premise that the State breached the plea agreement.  But this court has already found that the State's disclosure of other crimes was not a breach of the plea agreement.  Consequently, petitioner has not established a legal basis for which his objection to the State's disclosures, if raised by Ms. Fraser, would have been granted.

(ECF 6-11, p. 13.)

Moreover, Montgomery's ineffective assistance of trial claim fails to meet the standard established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). When a petitioner alleges a claim of ineffective assistance of counsel, he must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *See id.* at 687. Representation is deficient if it falls below an objective standard of reasonableness, considering all the circumstances. *Id.* at 688.

To satisfy the first part of this standard, it must be demonstrated that counsel's performance was not "within the range of competence normally demanded of attorneys in criminal cases." *Id.* at 687. The standard for assessing such competence is "highly deferential" and has a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 669. A federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. A petitioner must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 at 689). "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect." *Harrington*, 562 U.S. at 109 (citations omitted) (internal quotation marks omitted). "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 105 (citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

The second prong requires the Court to consider whether counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable and that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 690-94. "The benchmark of an ineffective assistance claim must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Id.* at 686. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient. *See id.* at 697.

Addressing the second prong, *see id.* at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed."), this Court finds that Montgomery has not been prejudiced by trial counsel's performance. As previously discussed, the plea agreement required the State to recommend a sentence of life, with all but 40 years suspended. (ECF 1-2, p. 4.)  Montgomery's attorney requested a sentence of life, with all but 20 years suspended. (ECF 6-3, p. 28).  Judge Heard ultimately sentenced Montgomery to "life, suspend all but 25 years." *Id.* at 42. This sentence is much closer to the defense's request than to the State's recommendation. Therefore, the Court concludes, Montgomery fails to satisfy *Strickland's* prejudice component. Montgomery has not demonstrated sufficient prejudice to render the sentencing proceedings unreliable. Moreover, this Court cannot find that the Circuit Court's application of the *Strickland* standard to the facts presented in the state court proceeding was unreasonable.  Therefore, relief based on

Montgomery's ineffective assistance of counsel claims is denied.

## CONCLUSION

Arguably, Montgomery has procedurally defaulted all of the claims he presents in the Petition. In any event, Montgomery's claims fail on the merits, giving due deference to the state court's factual findings. The Petition, therefore, is **DENIED AND DISMISSED.**

A Certificate of Appealability ("COA") will not issue because Montgomery has not made a "substantial showing of the denial of a constitutional right." [19] 28 U.S.C. 2253(c)(2); *see* Rule 11(a) of the *Rules Governing Section 2254 Proceedings in the United States District Courts*. A separate order follows.

_April 8, 2015_
Date

_Rd D Bennett_
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE

---

[19] When a district court dismisses a habeas petition solely on procedural grounds, a COA will not issue unless the petitioner can demonstrate both "(1) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right' and (2) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.' " *Rouse v. Lee*, 252 F.3d 676, 684 (4th Cir. 2001) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Denial of a COA in the district court does not preclude Montgomery from requesting a COA from the appellate court.